1  LISA C. HAMASAKI, CA Bar No. 197628
   lisa.hamasaki@ogletree.com
2  NESTOR GONZALEZ, CA Bar No. 335515
   nestor.gonzalez@ogletree.com
3  OGLETREE, DEAKINS, NASH, SMOAK &
   STEWART, P.C.
4  One Embarcadero Center, Suite 900
   San Francisco, CA  94111
5  Telephone:    415-442-4810
   Facsimile:    415-442-4870
6
7  Attorneys for Defendant
   PROVENA FOODS INC., doing business as
8  SWISS AMERICAN SAUSAGE CO.

9            **UNITED STATES DISTRICT COURT**

10           **EASTERN DISTRICT OF CALIFORNIA**

11

12 CARLOS IPINA, an individual,            Case No.

13           Plaintiff,                    **DECLARATION OF HILDA ISRADE IN**
                                           **SUPPORT OF DEFENDANT PROVENA**
14      v.                                 **FOODS INC.'S NOTICE OF REMOVAL**

15 PROVENA FOODS, INC., a California
   corporation doing business as SWISS
16 AMERICAN SAUSAGE CO.; and DOES 1
   through 20, inclusive,                  State Action Filed:   December 22, 2021
17                                         Trial Date:           None Set
           Defendant.
18

19

20

21

22

23

24

25

26

27

28

                                    1                     Case No.

I, HILDA ISRADE, hereby declare as follows:

1.     I am employed by Provena Foods Inc., doing business as Swiss American Sausage Co. ("Provena Foods") as its Human Resources, Safety, and Purchasing Manager for the Lathrop California facility and have worked for Provena Foods since March 2021.  I have personal knowledge of all of the facts set forth below, except those stated on information and belief, and if called upon to testify to the same, I could and would do so competently and truthfully.

2.     In my role, I have access to personnel files of Provena Foods' employees, including Mr. Ipina.  Provena Foods creates, keeps and maintains employee personnel files in the regular course of business and documents are placed into such files in a timely manner by individuals with knowledge of the information being entered.  Based on my review of Mr. Ipina's personnel file, I can attest that the plaintiff in this action, Carlos Alberto Ipina was an employee of Provena Foods from December 1, 2016 until his separation from employment on or about March 19, 2020.

3.     During his employment with Provena Foods, Mr. Ipina was a member of a union, the United Food and Commercial Workers Union 8 ("UFCW8") – Golden State.  Mr. Ipina's Application for Membership or Reinstatement to UFCW8 and attached Authorization for Deduction of Initiation Fee and Union Dues, which was maintained by Provena Foods in Mr. Ipina's personnel file, is attached hereto as **Exhibit A**.  Certain confidential information including Mr. Ipina's social security number, date of birth, voter status, and street address have been redacted from the document attached.

4.     During Mr. Ipina's employment there was a collective bargaining agreement applicable to Provena Foods' employees who were members of the UFCW8, including Mr. Ipina.  A true and correct copy of the Provena Foods and the UFCW8's Collective Bargaining Agreement ("CBA") for the period April 10, 2017 to August 10, 2020 is attached hereto as **Exhibit B**.  As an employee of Provena Foods and a member of the UFCW8, the terms and conditions of the CBA applied to Mr. Ipina and his employment.

/ / /

/ / /

/ / /

5.    In addition to other applicable provisions, the terms of the CBA expressly governed Mr. Ipina's vacation entitlements and the payout of any vacation in the event of separation from his employment.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _January 20_, 2022, at ___Lathrop___, California.

_Hilda M. Israde_
Hilda Israde

49912900.v1-OGLETREE

DECLARATION OF HILDA ISRADE IN SUPPORT OF DEFENDANT PROVENA FOODS INC.'S
NOTICE OF REMOVAL

# Exhibit A

# APPLICATION FOR MEMBERSHIP OR REINSTATEMENT

**UFCW 8**
**GOLDEN STATE**
United Food and Commercial Workers

**MAIN OFFICE**

2200 Professional Drive
Roseville, CA 95661-7711
(916) 786-0588

**WHOLESALE MEAT DIVISION**

2007 Yosemite Blvd.
Modesto, CA 95354
(209) 529-0596

1039 U Street
Fresno, CA 93721
(559) 237-0588

3485 W. Shaw Ave., Ste. 101
Fresno, CA 93711
(559) 271-1288

NAME (FIRST, MIDDLE, LAST): Carlos Alberto Ipina
REDACTED
SOCIAL SECURITY NO.: REDACTED
STREET ADDRESS: REDACTED    APT. NO.
CITY: Manteca    STATE: CA    ZIP: 95336
REGISTERED VOTER: REDACTED    MARITAL STATUS: S    SEX: M    DATE OF BIRTH: REDACTED    PHONE: REDACTED
HAVE YOU EVER BEEN A MEMBER OF UFCW?    DATES
LOCAL # / LOCATION    PRIOR NAME (IF APPLICABLE)
HOURLY WAGES: $11 63    JOB DESCRIPTION/CLASSIFICATION: Kitchen    Full-time: ✓    Part-Time
EMPLOYEE ID NO.    CURRENT HIRE DATE: 12-01-16
COMPANY: Swiss American Sausage Company

I authorize the UFCW to represent me for the purposes of collective bargaining and handling of grievances either directly or through such local union as it may duly designate.

DATE: X 12-01-16    SIGNATURE: X Carlos Ipina

**OFFICE USE ONLY**

MEMBER TYPE:    INITIATION:    X OFF:    DUES:    FEE AMOUNT:
DEFERRED INITIATION:
J F M A M J J A S O N D    D.B.

## Authorization for Deduction of Initiation Fee and Union Dues
## UFCW 8 - GOLDEN STATE

I hereby authorize and direct my employer

to deduct from the first pay payable to me each month, the regular monthly Union dues payments for the preceding month to the United Food and Commercial Workers Union 8 - Golden State and the initiation fee of said Union if certified by the Union to be due and owing, and to remit same to the local Union, This authorization and direction shall be irrevocable for the period of one year or until the termination of the Collective Bargaining Agreement now in force between the Employer and the Union, whichever occurs sooner. I further agree and direct that this authorization and direction shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period each succeeding applicable Collective Bargaining Agreement between the Employer and the Union, whichever shall be shorter, unless written notice of revocation is given by me to the Employer and the Union, not more than thirty (30) days and not less than ten (10) days, prior to the expiration of any period of irrevocability as above defined.

Amount of initiation $100.00    Current Monthly Dues $34.65

NAME: Carlos Ipina    SOCIAL SECURITY #: REDACTED
HOME ADDRESS: REDACTED
CITY: Manteca    STATE: CA    ZIP: 95336
EMPLOYER: Swiss American Sausage Company    EMPLOYEE ID NO.
SIGNATURE: Carlos Ipi    DATE: 12-01-16

Union Dues and Initiation Fees are not normally tax deductible for the purpose of Federal and State Income Taxes.

# Exhibit B



# Jacques Loveall
President
International Vice President

## COLLECTIVE BARGAINING
## AGREEMENT

## WITH

## SWISS AMERICAN/HORMEL SAUSAGE

## APRIL 10, 2017 – AUGUST 10, 2020

# INDEX

| | SECTION | PAGE |
|---|---|---|
| Discharge................................................................................................ | 4 | 3 |
| Dues Checkoff ....................................................................................... | 19.4 | 18 |
| Employment............................................................................................. | 3 | 3 |
| Extension and Scope ............................................................................. | 26 | 20 |
| Funeral Leave......................................................................................... | 9.4 | 9 |
| General Benefits .................................................................................... | 16 | 14 |
| Grievance and Arbitration .................................................................... | 18 | 16 |
| Health and Welfare ............................................................................... | 12 | 11 |
| Holidays.................................................................................................. | 7 | 6 |
| Hours ...................................................................................................... | 5 | 4 |
| Job Security ........................................................................................... | 21 | 18 |
| Jury Duty................................................................................................. | 15 | 14 |
| Leaves of Absence ............................................................................... | 9 | 9 |
| No Strike or Lockout ............................................................................. | 25 | 20 |
| Overtime ................................................................................................. | 6 | 5 |
| Pension/Retirement Benefits................................................................ | 14 | 13 |
| Probation Period ................................................................................... | 1.4.3 | 2 |
| Recognition and Jurisdiction ............................................................... | 1 | 1 |
| Savings Clause...................................................................................... | 24 | 19 |
| Seniority.................................................................................................. | 17 | 15 |
| Separability............................................................................................ | 22 | 19 |
| Sick Leave ............................................................................................. | 13 | 12 |
| Superannuated Employees................................................................... | 11 | 11 |
| Supervisors............................................................................................ | 1.2 | 1 |
| Transfer of Ownership........................................................................... | 23 | 19 |
| Union Affairs .......................................................................................... | 19 | 17 |
| Union Security........................................................................................ | 2 | 2 |
| Vacations................................................................................................ | 8 | 7 |
| Wages ..................................................................................................... | 10 | 10 |
| Working Conditions and Safety ........................................................... | 20 | 18 |

# COLLECTIVE BARGAINING AGREEMENT
## BETWEEN
## UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE
## AND
## SWISS AMERICAN/HORMEL SAUSAGE

**THIS AGREEMENT**, is made and entered into by and between **SWISS AMERICAN/HORMEL SAUSAGE**, located at 251 D'Arcy Parkway, Lathrop, California, hereinafter referred to as the "Employer" or "Company," and **UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**, hereinafter referred to as the "Union."

### W I T N E S S E T H:

In order to establish working conditions which are fair and equitable to the Employer and all employees, the parties hereto agree to the following:

The parties to this Agreement recognize the competitive nature of the Industry and further agree that no employee will be required to work hours in excess of the working hours established in this Agreement.

### RESPECTABILITY:

The Employer recognizes that employees are entitled to be treated with dignity and fairness on the job. To that purpose, the Employer agrees that employees shall be free from harassment, unfair treatment, disrespect, intimidation, and any form of illegal discrimination from supervisors and management.

### SECTION 1.   RECOGNITION AND JURISDICTION

**1.1     UNION RECOGNITION:**  The Employer hereby recognizes the Union as the exclusive bargaining agent for all employees employed in the classifications set forth in Section 10 Wages hereof working in the Plant of the Employer located in San Joaquin County, California.

**1.2     SUPERVISORS:** Supervisors will not be a part of the bargaining unit, will not be required to join the Union, but will be permitted to perform whatever work the Company assigns; provided, however, that the number of Supervisors shall be limited to a number equal to ten percent (10%) of the number of bargaining unit employees.

**1.3     PERFORMANCE OF BARGAINING UNIT WORK:** The Employer agrees that only employees included in the bargaining unit shall perform any of the work coming within the jurisdiction of this Agreement, provided, however, that non-bargaining unit employees may perform bargaining unit work, where necessary, for emergencies beyond the control of the Employer, work in the instruction or training of employees and testing materials in production.

**1.4    EMPLOYEE STATUS:**

**1.4.1   REGULAR EMPLOYEE:**   A regular employee is one who has completed the probationary period for all new employees in accordance with Section 17 Seniority hereof. Extra employees (agency personnel) shall be offered employment after completion of eleven (11) workweeks.

**1.4.2   EXTRA EMPLOYEE:**   An extra employee is any employee hired either to relieve a regular employee or to supplement the existing force. Extra employees shall not be employed to displace regular employees. An extra employee who works nine (9) workweeks for the same Employer within a twelve (12) month period shall become a regular employee for the purposes of benefit eligibility. Extra employees may be scheduled less than forty (40) hours per week. Regular employees on layoff shall be hired first. No extra employees will be hired when regular employees in the same classification are on layoff.

It is agreed and understood that assignment of employees to work less than forty (40) hours per week within the meaning of this provision, shall not operate to replace any existing employees and, further, the hiring of employees to work less than forty (40) hours per week shall not be done for the purpose of permanently replacing full-time positions. In the event of a reduction in force, those employees regularly scheduled to work less than forty (40) hours per week shall be laid off prior to the layoff of any regular employees.

**1.4.3   PROBATIONARY EMPLOYEE:**   A probationary employee is one who has not yet completed the required eleven (11) workweeks of trial employment with the current Employer, as specified in Section 17 Seniority herein. New employees to the Industry hired on or after April 1, 1988, shall not be entitled to health and welfare contributions, holidays, funeral leave, sick pay, and jury duty pay during the probationary period.

**1.5    MANAGEMENT RIGHTS:**   The Employer shall have the right to the general management of all operations and the direction of the work force, including, but not limited to, the right to hire, transfer, promote, maintain discipline and efficiency, layoff, establish new processes or use new equipment, establish schedules of production, and to extend, limit, or curtail its operations. Nothing in this Agreement shall be construed, by any manner or means, to preclude the subcontracting of work by the Company or to require the Company to perform work at this plant, rather than elsewhere, so long as the rights specified herein are not exercised in a manner inconsistent with this Agreement.

## SECTION 2.   UNION SECURITY

**2.1    UNION MEMBERSHIP:**   Every person performing work covered by this Agreement who is a member of the Union on the effective date of this section shall, as a condition of employment or continued employment, remain a member of the Union. Every person employed to perform work covered by this Agreement shall, as a condition of employment, be a member of the Union or shall, within a period of thirty-one (31) days after the effective or execution date of this Agreement, whichever is later, become a member of the Union.

**2.2    MAINTENANCE OF MEMBERSHIP:**   The Employer shall discharge every person who has failed to comply with the provisions of Subsection 2.1 above at the end of the workday during which notice of such noncompliance is received. The Employer further agrees not to again employ or re-employ any person(s) so discharged until he/she is a member of the Union; provided, however, in the event that the Labor Management Relations Act, as amended, is applicable to this Agreement, the provisions of this sentence of this Subsection 2.2 shall not be applied until a final administrative or judicial decision has been rendered which would permit its application under the Act.

**2.3    APPLICANTS FOR MEMBERSHIP:** Membership in the Union shall be available to persons employed in work covered by this Agreement upon terms and qualifications not more burdensome than those applicable generally to other applicants for such membership.

## SECTION 3.   EMPLOYMENT

**3.1    NO DISCRIMINATION:** The Employer shall have sole responsibility for and full freedom in the selection, employment, and discharge of persons employed or to be employed in work covered by this Agreement, subject to the provisions of this Agreement, provided that there shall be no discrimination because of membership or non membership in or participation or nonparticipation in the activities of the Union. The Employer will not discharge or discriminate against any employee for upholding lawful Union principles such as serving as an officer or other representative of the Union, soliciting membership in the Union, wearing Union buttons, distributing Union literature, or attending Union meetings provided that such activity does not interfere with his/her work. The Employer will not discharge or discriminate against any employee for failing or refusing to purchase stock, bonds, securities, or any other interest in any corporation, partnership, or company.

**3.2    HIRING NOTIFICATION:** An Employer who desires to employ a person in work covered under this Agreement shall inform the Union of the number and qualifications of persons desired and the location of the job site in advance of the time that such persons are required.

**3.3    HIRING CONSIDERATION:** In the hiring of new employees, the Employer agrees that it will give equal consideration to all applicants, including those referred by the Union. The Employer and the Union will not discriminate against any employee with regard to compensation or terms and conditions of employment because of such individual's race, color, religion, sex, age (to the extent provided by law), or national origin; nor will they limit, segregate, or classify employees in any way to deprive any individual employee of employment opportunities because of their race, color, religion, sex, age (to the extent provided by law), or national origin. Any reference to the male gender in this Agreement shall be in the generic sense and it shall refer equally to either sex without discrimination, as provided above.

**3.4    UNION NOTIFICATION:** The Employer shall notify the Union within one (1) week of the name, address, social security account number, and classification of every such person employed in work covered by this Agreement, together with the date of such employment and the location of the place or prospective place of employment. Whenever a person is rejected for or discharged from such work, the Employer shall, upon request of the Union, notify the Union of the reason or reasons therefore. The notification required by this subsection shall be made, in writing, within forty-eight (48) hours after such request. Any employee hired shall report to the Union within one (1) week after the date of employment to fill out and sign applications, forms, and papers for health and welfare, dental, and pension purposes.

## SECTION 4.   DISCHARGE

**4.1    PROHIBITION AGAINST DISCHARGE:** No employee covered by this Agreement shall be suspended, demoted, or discharged without just and sufficient cause. Discharge for failure to comply with Section 2 Union Security, Subsection 2.1 of this Agreement shall be deemed a discharge for cause. Before an employee is suspended for more than three (3) days or discharged, he/she shall receive written warning of unsatisfactory conduct and a copy of such notice shall be sent to the Union. Such written warning shall not be effective for suspension actions for more than nine (9) months. The employee receiving such warning shall be given reasonable opportunity to rectify or change such conduct. The notice and warning required by this subsection need not be given to employees disciplined for, but not limited to, any gross violation of reasonably acceptable conduct.

**4.2    RIGHT OF APPEAL:**  Any employee claiming unjust dismissal, demotion, or suspension shall make his/her claim therefore to the Union within ten (10) working days of such dismissal, demotion, or suspension, and the Union will, that day, notify the Employer by telephone and confirm in writing, otherwise no action shall be taken by the Union. If, after proper investigation by the Union and the Employer, it has been found that an employee has been disciplined unjustly, he/she shall be reinstated with full rights and shall be paid his/her wages for the period he/she was suspended, demoted, or dismissed. Investigation of any claims shall be made within ten (10) days of the making of such complaint by the employee. Any dispute arising out of such suspension, demotion, or discharge shall be processed under Section 18 Grievance and Arbitration of this Agreement.

**4.3    NOTIFICATION OF DISCHARGE:** When an employee is discharged, the Employer must give written notice to the employee, stating the reasons for such discharge, and the Union shall receive a copy of said notice. Upon written notification by the Union of an employee holding a second job, the Employer will either terminate the employment of the employee or require that he/she resign his/her second job. Where an employee is holding a full-time second job, the Employer, five (5) working days after written notice to the employee requesting he/she resign his/her second job, may terminate him/her if he/she does not do so.

## SECTION 5.  HOURS

**5.1    HOURS OF OPERATION:** The hours of operation of the Employer's facility shall be as hereunder provided and shall apply to all employees of the Employer covered herein. Hours worked in excess of eight (8) straight-time hours in a day or in excess of forty (40) straight-time hours in any week shall be paid at one and one-half (1½) times the straight-time rate.

**5.2    POSTING REQUIREMENT:** All regular employees shall have their schedule posted by Thursday noon for the following workweek. It shall not be changed except by reason of an act of God or other reason beyond the reasonable control of the Employer. The schedule shall show the full name of the employee, the starting times, and the days scheduled for him/her during the following week, in ink or typewritten. In case of scheduled weekend work, the Employer shall notify the employees by posting a weekend work notice by the end of the shift(s) on Thursday of each week. In the case of extra available daily or weekend work, the Employer shall post a weekly notice for employees every Monday to sign to inform the Company of their interest for such extra available work. Plant seniority by shift shall prevail, providing such employee(s) can perform such work. Employee(s) shall be notified by the Company of available work.

**5.3    SCHEDULE OF SHIFT:** All first-shift hours shall be regularly scheduled to commence no earlier than 4:30 a.m., and no later than 10 a.m. The second-shift hours shall commence on or after 10 a.m., and no later than 5 p.m. The third-shift hours shall commence on or after 5 p.m., and before 5 a.m. All work commenced on or after 10 a.m., but no later than 5 p.m., shall be paid for at the rate of the second-shift premium for all hours worked. All work commenced on or after 5 p.m., and before 5 a.m., shall be paid at the third-shift premium for all hours worked.

**5.4    GUARANTEED WORKWEEK:** Regular employees shall be guaranteed payment for and expected to work eight (8) hours each day, forty (40) hours for each week, subject to the addition of all premium and overtime provisions, unless such work ceases to be available by reason of an act of God or other reason beyond the control of the Employer. Employees unable to work eight (8) hours a day, forty (40) hours a week shall provide a reasonable explanation and verification of the reason of absence where appropriate and in compliance with the provisions of this Agreement.

**5.5 REGULAR WORKWEEK:** The regular workday shall consist of eight (8) hours within nine (9) hours, Monday through Friday, Tuesday through Saturday inclusive. A Sunday through Thursday workweek may be utilized for the Dry Room area only.

**5.6 MINIMUMS:** Five (5) days consisting of eight (8) working hours per day, forty (40) hours Monday through Friday, inclusive, except as otherwise herein provided, shall constitute a workweek for all eligible employees except that during a week in which a holiday falls, the workweek shall consist of thirty-two (32) hours. Employees called to work will be provided with a minimum of eight (8) hours' work or pay in lieu of work, such pay to start from the hour the employee is required to report for work, except in case of matters beyond the control of the Employer. Employees doing security inspection or quality control shall be guaranteed a minimum of one (1) hour of work or pay in lieu thereof.

**5.7 SHORT WORKWEEK:** As an exception to the guaranteed workweek, the Employer shall be permitted to designate shortened work schedules. No more than sixteen (16) hours shall be used in any one (1) week. Total amount of hours shall not exceed a maximum of one hundred thirty-six (136) hours per contract year.

**5.8 BID ON JOB SHIFTS:** Employees shall have the right to bid on job shift assignments in the order of their seniority except that no employee shall have this opportunity more often than once in every six (6) month period, except when a shift is reestablished within the six (6) months. It is understood that this privilege shall not result in chain bumping. When a shift is discontinued, the senior employee shall have the right to bid on the job classification in the existing shift.

**5.9 CALL BACK:** An employee called back to work within twelve (12) hours from the end of his/her shift shall be paid at one and one-half (1½) times his/her applicable rate for the hours worked prior to the expiration of such hours.

**5.10 MEAL PERIODS:** All employees shall receive one (1) full uninterrupted hour for a meal period or, by mutual agreement between the employees, the Employer, and the Union, one-half (½) hour approximately in the middle of the workday, and in no event shall an employee work more than five (5) hours before any meal period. In agreeing on lunch periods, the parties will consider the requirement set by the USDA for Meat Inspectors.

**5.11 REST PERIODS:** All employees shall receive two (2), fifteen (15) minute rest periods in an eight (8) hour day. Employees shall receive an additional ten (10) minute rest period at ten (10) hours.

> **5.11.1** All employees shall receive two (2) fifteen (15) minute rest periods in an eight (8) hour day. These breaks may not be waived.

> **5.11.2** Employees working ten (10) hours shall receive an additional ten (10) minute break. At the Employer's option, employees may be sent home ten (10) minutes early (with pay) in lieu of getting this overtime break.

## SECTION 6.  OVERTIME

**6.1 OVERTIME PAY:** All work in excess of eight (8) hours in one (1) day and all work in excess of forty (40) hours in one (1) week shall be paid for at the overtime rate, which shall be one and one-half (1½) times the employee's regular straight-time hourly rate of pay.

Employees shall be paid at one and one-half (1½) times the employee's regular straight-time rate of pay for all work performed on the sixth (6th) day of the employee's workweek. All work performed in excess of ten (10) hours in any one (1) day shall be paid for at the overtime rate of two (2) times the employee's regular straight-time rate of pay. When overtime work is scheduled for Sundays and holidays, such work shall be paid for at the overtime rate of two (2) times the employee's regular straight-time rate of pay. All work performed either before the employee's scheduled eight (8) hour shift or after the completion of his/her scheduled eight (8) hour shift, except as provided above, shall be paid for at the rate of one and one-half (1½) times the employee's regular straight-time rate of pay. In the event an employee is required to report for work earlier than his/her scheduled shift starting time, the Employer shall schedule a minimum of thirty (30) minutes of work time in this period. There shall be no pyramiding of overtime under this Agreement. Extra employees will be given the preference whenever possible to avert overtime.

In order to be eligible for premium pay [time and one-half (1½) and double time (2)] on Saturday, Sunday, or on the sixth (6th) or seventh (7th) consecutive day, an employee must work all of his/her scheduled hours in the workweek. An employee absent without management approval during his/her scheduled workweek shall not receive the applicable premium pay for Saturday, Sunday, or sixth (6th), seventh (7th) day premium pay until such employee has completed all hours missed during that scheduled workweek. The exception to this requirement would be when an employee is off because of a verified on-the-job injury during the workweek. Under no circumstances shall an employee receive less pay than is required by the applicable California Industrial Welfare Commission Wage Order.

## SECTION 7.  HOLIDAYS

**7.1**    The following holidays shall be recognized and observed annually under this Agreement and eligible employees, set forth in Subsection 7.3 below, shall receive pay for said holidays as if worked:

New Year's Day, Martin Luther King's Birthday, Easter Monday, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Day after Thanksgiving, Christmas Day, and Employee's Birthday.

**7.2    EMPLOYEE'S BIRTHDAY:**  Each employee shall give his/her Employer notice of his/her birthday at least two (2) weeks prior to the week in which the birthday occurs. When the necessities of the Employer's business preclude the granting of the holiday on such birthday of the employee, the Employer shall notify the employee during the week in which the employee gave notice of the birthday to the Employer and a change shall be scheduled by mutual agreement in the week preceding or in the week following the week of the employee's birthday. The birthday holiday shall apply only to regular employees who have been employed by the Company for one (1) full year. If an employee's birthday falls on a day which is otherwise considered as a holiday or on a Saturday or Sunday, he/she shall receive an additional day off for the birthday in addition to the holiday on which it falls or may receive pay [eight (8) hours at the straight-time rate of pay] by mutual agreement with the Employer. The birthday holiday must be taken within each contract year or it shall be lost.

**7.3    HOLIDAY PAY ELIGIBILITY:** Non-probationary employees working their scheduled workday before and their scheduled workday after the holiday shall receive pay for the holiday, except that any employee who is absent due to illness or injury for a period not in excess of thirty (30) days, or death in the immediate family and is, therefore, unable to work the scheduled workday before and the scheduled workday after the holiday shall receive pay for the holiday. If a regular employee worked in the week before Christmas week or in the week following New Year's Day week, he/she shall be paid for both holidays. Any regular employee on temporary

layoff who worked any portion of the week preceding, the week of, or the week following the holiday week shall be paid for the holiday if temporary layoff has not and does not exceed three (3) weeks. Extra employees working the workdays in the week of the holiday shall be paid for the holiday.

**7.4     HOLIDAYS FALLING ON SATURDAY/SUNDAY:** When one of the above enumerated holidays falls on Sunday, then Monday shall be considered as the holiday. When one of the above enumerated holidays falls on Saturday, then Friday shall be considered as the holiday.

**7.5**     Any work on the fifth (5th), sixth (6th), or seventh (7th) day in a holiday workweek shall be offered as stated in Section 6.2 Daily Overtime.

## SECTION 8.  VACATIONS

**8.1     VACATION BENEFITS:** All regular employees who have been in the employ of the Employer for at least one (1) year shall be entitled to receive vacation benefits as specified below. Employees going on vacation shall receive pay for said vacation period prior to leaving on vacation.

> **8.1.1**   One (1) week's [five (5) days] vacation with pay after completion of the first year of service.
>
> **8.1.2**   Two (2) weeks' [ten (10) days] vacation with pay after completion of the second year of service.
>
> **8.1.3**   Three (3) weeks' [fifteen (15) days] vacation with pay after completion of the fifth year of service.
>
> **8.1.4**   Four (4) weeks' [twenty (20) days] vacation with pay after completion of the fifteenth year of service.
>
> **8.1.5**   Four (4) weeks and two (2) additional vacation days after completion of twenty-five (25) years of service.

**8.2     VACATION SIGN-UP:** All employees will receive their vacation allowance on January 1st.

Every November each department will establish a vacation schedule for the upcoming calendar year. The time period for choosing and scheduling vacations will start November 1st and end December 15th each year.

> **8.2.1**   In order to facilitate vacation planning, all employees will be required to choose vacation weeks in order of seniority. Employees may choose to take one (1) week's vacation as individual days rather than full weeks. Individual days will be treated the same as any other vacation request.
>
> **8.2.2**   Employees who fail to schedule their vacation during the selection period as provided in this policy shall be scheduled by the Employer in any open slots available. All vacation earned in a year must be used in that year, no carry over will be allowed.

**8.2.3**   If an employee needs to make a change to a scheduled vacation, they need to discuss the change with their Supervisor.  If there is availability and adequate coverage in the department during their desired time slot, then the request may be granted.  All changes to an established vacation need to be made in writing at least two (2) weeks before the desired time slot.

**8.2.4**   The Employer will designate the maximum number of employees allowed to choose a given week and available time slots will be distributed so that there is adequate production coverage in each department.

**8.2.5**   In the event an employee is terminated or voluntarily quits, the employee's final paycheck will be held by the Employer until their vacation accrual account has been reconciled.

**8.2.6**   The Employer may offer available work to an employee during his/her vacation. Work days and hours will be offered before an employee leaves on vacation or during the vacation week but such work shall not be mandatory.

**8.2.7**   A vacation week will be defined as five (5) work days Monday through Friday in a seven (7) day calendar week Monday through Sunday. Vacations must be scheduled two (2) weeks prior and approved by management; vacation may be used one (1) day at a time.

**8.3**   **PRORATED VACATION PAY UPON SEPARATION FROM EMPLOYMENT:**   Upon termination of employment or change of ownership of a Plant, employees shall receive prorated vacation pay based on each full month worked since the employee's last anniversary date of employment; provided, however, vacation pay shall not be paid during the first year of employment in cases of discharge for cause or voluntary quit, except that on voluntary quits where one (1) week's notice has been given to the Employer, the employee shall receive prorated vacation pay.

| Employment Period | Rate of Accrual |
|---|---|
| First six (6) months | None |
| After six (6) months | 1/6 week per month |
| After four (4) years | 1/4 week per month |

**8.4**   **PRORATED VACATION FORMULA FOR EMPLOYEES WORKING LESS THAN A FULL YEAR:**   An employee shall receive full vacation pay at his/her regular weekly rate of pay if he/she works one hundred and eighty (180) days or more during his/her anniversary year. If an employee works less than one hundred and eighty (180) days during his/her anniversary year, he/she shall receive prorated vacation pay. Such prorated vacation pay shall be computed by taking his/her gross earnings during his/her anniversary year, divided by fifty-two (52), and multiplied by the number of weeks of vacation to which the employee is entitled according to his/her length of service. Calculation of vacation under this subsection is permitted only on an employee's anniversary date and is not to be used for incomplete years.

**8.5**   **HOLIDAY DURING VACATION:**   When a holiday falls within the employee's vacation period, he/she shall be eligible for a paid day off at a time mutually agreeable to the employee and the Employer except that, if the employee and the Employer mutually agree, the employee may receive pay in lieu of the holiday.

**8.6**   **ESTATE BENEFIT:**   In the event of the death of an employee who is eligible for sick leave and vacation pay, his/her estate, or the person legally entitled thereto, shall receive prorated vacation and sick pay computed under the provisions of Subsection 8.3 above and Section 13 Sick Leave, Subsection 13.1 of this Agreement

## SECTION 9.  LEAVES OF ABSENCE

**9.1**   **APPROVED LEAVE OF ABSENCE:**  The Employer may grant leaves of absence to employees based on the merit of the leave. Request and permission must be in writing. An employee who fails to report for work at the end of a leave of absence shall terminate seniority rights except where the Employer has agreed to extend the leave of absence. A thirty (30) day leave of absence, without pay, shall be allowed where necessary in order to care for necessary details resulting from the death of a member of the employee's immediate family as defined below. All leaves of absence granted in this Agreement shall be considered as part of the continuous service with the Employer, subject to the limitations outlined in Section 17 Seniority, Subsection 17.3 hereof. When a personal leave of absence is granted to an employee by the Employer, a written notice shall be given to evidence such an arrangement. Employees shall use all vacation time and personal holidays prior to the start of any leave of absence.

**9.2**   **UNION BUSINESS:**  Employees chosen by the Union to attend Union business outside the plant shall, with permission of the Employer, be granted a leave of absence without pay, not exceeding thirty (30) days. A request for such leave of absence shall be made at least seven (7) working days prior to the first (1st) day of absence, except that such notice need not be provided for absences to attend collective bargaining negotiations.

**9.3**   **NON-PAID FUNERAL LEAVE:**  In the event of a death of a person other than those identified in this section, the employee shall be given one (1) day off upon request, without pay, for the purpose of attending the funeral unless the number of requests for attendance at the funeral would unduly hamper the operation of the Employer's business during the time of the funeral, in which case attendance at the funeral shall be granted on the basis of the order in which the requests were made.

**9.4**   **FUNERAL LEAVE:**  When a regular full-time employee on the active payroll is absent from work for the purpose of arranging or attending the funeral of a member of his/her immediate family, as defined below, the Employer shall pay him/her for eight (8) hours at his/her regular rate of pay for each day of such absence up to a maximum of three (3) days provided:

   **9.4.1**   The employee notifies the Employer of the purpose of his/her absence on the first day of such absence.

   **9.4.2**   The absence occurs on the day during which the employee would have worked but for the absence.

   **9.4.3**   The day of absence is not later than the day of such funeral except where substantial travel time is required.

   **9.4.4**   **PROOF OF RELATIONSHIP:** The employee, when requested, shall furnish proof satisfactory to the Employer of the death, his/her relationship to the deceased, the date of the funeral, and the employee's actual attendance at such funeral. For the purpose of this Agreement, a member of the immediate family means the employee's spouse, child, mother, father, sister, brother, mother-in-law, father-in-law, grandparents, grandchildren, stepparents, stepchildren, and step brother/sister.

**9.5**   **EXTENDED LEAVE OF ABSENCE:**  Employees with one (1) or more years of service with the Employer may request up to a maximum of eight (8) weeks' unpaid leave, if available, to be taken concurrently with the employee's regularly scheduled vacation. Employees desiring to obtain such a leave of absence must notify the Employer at the same time they indicate their vacation preference. The Employer shall utilize seniority in granting and authorizing requested concurrent vacation and leave of absence. The Employer shall notify the employee, in writing, authorizing the specific time agreed upon. Any employee who utilizes the concurrent vacation

and leave of absence program shall wait three (3) years to utilize the concurrent program again. Nothing in this section shall preclude any employee from requesting or the Employer from granting leaves of absence defined in Subsection 9.1 above.

### SECTION 10.   WAGES

**10.1   WAGES:**  The following wages shall be paid:

### ALL PRODUCTION:

| BRACKET | EFFECTIVE | | | |
|---|---|---|---|---|
| | Current Base Rate | 08/07/2017 40¢ | 08/06/2018 40¢ | 08/05/2019 44¢ |
| **Bracket A - Technician** | 16.46 | 16.86 | 17.26 | 17.70 |
| **Bracket B – Skilled Labor** | 15.46 | 15.86 | 16.26 | 16.70 |
| **Bracket C – Semi-Skilled Oper.** | 14.46 | 14.86 | 15.26 | 15.70 |
| **Bracket D – Semi-Skilled Labor** | 13.96 | 14.36 | 14.76 | 15.20 |
| **Bracket E – General Labor** | 13.46 | 13.86 | 14.26 | 14.70 |
| **Entry Level Progression** | 11.61 | 12.50 | 13.00 | 13.50 |

**Second Shift:** Thirty cents (30¢) per hour above classification rate.
**Third Shift:**    Thirty-five cents (35¢) per hour above classification rate.

### MAINTENANCE:

| CLASSIFICATION | EFFECTIVE | | | |
|---|---|---|---|---|
| | Current Base Rate | 08/07/2017 40¢ | 08/06/2018 40¢ | 08/05/2019 44¢ |
| **Maintenance Worker** | 25.46 | 25.86 | 26.26 | 26.70 |
| **8th 6 months** | 20.21 | 20.61 | 21.01 | 21.45 |
| **7th 6 months** | 19.96 | 20.36 | 20.76 | 21.20 |
| **6th 6 months** | 19.71 | 20.11 | 20.51 | 20.95 |
| **5th 6 months** | 19.46 | 19.86 | 20.26 | 20.70 |
| **4th 6 months** | 19.21 | 19.61 | 20.01 | 20.45 |
| **3rd 6 months** | 18.96 | 19.36 | 19.76 | 20.20 |
| **2nd 6 months** | 18.71 | 19.11 | 19.51 | 19.95 |
| **1st 6 months** | 18.21 | 18.61 | 19.01 | 19.45 |

Employees hired after April 12, 2017, and employees with less than one (1) year of service upon ratification, will receive a fifty cent (50¢) per hour rate increase after completion of probation and will receive the appropriate bracket rate after six (6) months of employment.

Any employee who Is still earning above bracket as of the effective date of the rate increases above shall receive a three hundred fifty dollar ($350) bonus at the end of the year in lieu of a rate increase.

Maintenance employees may be hired at a pay scale, based on past and current skills and abilities, higher than what is set in the wage section of the Collective Bargaining Agreement.

**RATIFICATION BONUS:** Within two (2) weeks after ratification of the new Agreement, the Company shall pay each current employee a lump sum ratification bonus of three hundred fifty dollars ($350).

**10.2   RECORDS:** The Employer agrees to keep records of time worked by all employees in such a manner as is prescribed by the applicable provisions of the Fair Labor Standards Act, whether or not that Act actually applies to the Employer. The Employer shall install a time clock for the purpose of keeping accurate records of the hours worked by each employee. Upon request, the Employer shall permit the Union to examine the payroll records of the employees in the bargaining unit at reasonable times during the regularly scheduled working hours.

## SECTION 11.  SUPERANNUATED EMPLOYEES

**11.1**   Any employee whose earning capacity is limited because of advanced age or other handicaps that may interfere with his/her normal employment activities may be employed on suitable work at a wage agreed upon by the employee, the Employer, and the Union.

## SECTION 12.  HEALTH AND WELFARE

**12.1**   The Employer agrees to continue to make payments to the UFCW Wholesale Health Trust Fund for the purpose of paying health and welfare benefits for eligible employees and their eligible dependents. The Employer shall begin hourly contributions after sixty (60) days of employment. Eligibility and employee contribution obligations shall commence after ninety (90) days of employment.

**12.1.1 CONTRIBUTIONS:** Effective for hours worked in August and payable in September, the Company shall contribute the amounts listed below per straight-time hour worked, or paid for, for each eligible employee employed under this Agreement to the Northern California UFCW Wholesale Health and Welfare Fund.

| Company | 08/07/2017 | 08/06/2018 | 08/05/2019 |
|---------|------------|------------|------------|
|         | $8.75/hour | $9.50/hour | $10.00/hour |

The above constitutes the Employer's sole obligation for contributions to the Wholesale Health and Welfare Plan during the term of this Agreement.

Effective in August, employees shall contribute the amounts listed below to the Employer for purposes of offsetting the Employer's health care contributions:

| Employee | 08/07/2017 | 08/06/2018 | 08/05/2019 |
|----------|------------|------------|------------|
|          | $35/week   | $38/week   | $41/week   |

If at any time it is determined by the Board of Trustees of the UFCW Wholesale Trust Fund that the contributions required of the Employer, as outlined above, will not be sufficient to maintain the benefits, the amount needed will be deducted from the employees' pay and shall become part of the Employer's Health and Welfare contribution rate for the remaining term of the Agreement.

**12.2**   Contributions shall be made on all straight-time hours worked and/or compensated for. It is understood that the contributions required on behalf of any employee shall not exceed forty (40) straight-time hours per week or two thousand eighty (2,080) straight-time hours in any calendar year. In order to qualify for health and welfare coverage, employees must work or be compensated for a minimum of eighty (80) straight-time hours per month in addition to meeting other eligibility requirements as established by the current plan of benefits.

**12.3**   The parties recognize and acknowledge that the regular and prompt payment of Employer contributions to the Fund is essential to the maintenance of the Health and Welfare Plan and, inasmuch as beneficiaries under the Plan are entitled to benefits for the period of time that they may have worked while covered by the Plan even though contributions have not been paid on their behalf by their Employer, that it would be extremely difficult, if not impractical, to fix the actual expense and damage to the Fund and to the Health and Welfare Plan which would result from the failure of an individual Employer to pay such monthly contributions in full within the time provided. Therefore, the amount of damage to the Fund and Health and Welfare Plan resulting from such failure shall be presumed to be the sum of twenty-five dollars ($25.00) per delinquency, or ten percent (10%) of the amount of the contribution or contributions due, whichever is greater, which amount shall become due and payable to the Fund as liquidated damages, and not as a penalty, upon the day immediately following the date upon which the contribution or contributions became delinquent, as well as any further sums permitted by law.

### SECTION 13.   SICK LEAVE

**13.1**   **ANNUAL ALLOWANCE:** All regular employees shall be entitled to five (5) days of sick leave per year, to be granted on January 1, of each year.

**13.2**   **SICK LEAVE PAY:**  Sick leave shall commence with the first (1st) day of absence for sickness or accident except as prescribed in Subsection 13.2.1 below. Sick leave shall always be paid for the first (1st) day of absence when the employee is hospitalized or when the first day of absence is the day following an injury incurred on the job for which the employee required medical treatment. A day's sick and accident benefits shall mean a day's pay at the rate in effect at the time the employee qualifies to receive the sick and accident benefits and may actually be spread over more than one (1) day to integrate with other payments contemplated in Subsection 13.3 below.

**13.3**   **INTEGRATION WITH WORKER'S COMPENSATION OR UNEMPLOYMENT DISABILITY INSURANCE:** An employee who is collecting unemployment compensation disability benefits or worker's compensation temporary disability benefits, or both, shall not receive sick and accident benefits as provided herein; provided, however, if such unemployment compensation disability benefits or worker's compensation temporary disability benefits, or both, are less than the amount of the sick and accident benefits provided herein for such period, such employee shall receive sick and accident benefits in addition to such unemployment compensation disability benefits or worker's compensation temporary disability benefits, or both, in an amount sufficient to equal the amount of sick and accident benefits he/she would have otherwise received as provided herein. All sickness and accident benefit payments due under this subsection shall be payable on the employee's regular pay period.

**13.4**   **PROOF OF ILLNESS:**  The Employer shall reserve the right to request the employee to produce a medical doctor's certificate verifying the fact of such illness. An employee may be excused from the requirement to provide medical verification of illness provided the following criteria are met:

**13.4.1** The absence does not exceed two (2) days including any holiday which is the day before or after the day of absence.

---

**13.4.2** An employee's sick leave shall be available to use whenever an employee is scheduled.

**13.4.3** Upon request, the employee signs a statement stating he/she was unable to work because of illness which did not require medical attention and that any false statement will be grounds for disciplinary action. The employee and/or doctor must check in at not more than two (2) week intervals with the Company when an employee is out on an illness in order to protect his/her rights under Section 17 Seniority hereof.

**13.4.4** The Employee calls his/her supervisor no later than thirty (30) minutes prior to the regular starting time on the day of each such absence stating the reasons for the absence.

**13.5   JOB INJURY:** An employee who is injured on the job and does not complete that day's work or is otherwise not permitted to return to work, shall receive pay for the entire workday and such pay shall not be charged against sick leave or accident leave; provided, the employee is sent home or is otherwise not permitted to work by a medical doctor, chiropractor, or osteopath on the approved list of the insurance carrier of the Company.

**13.6   MEDICAL APPOINTMENTS:** Visits to the doctor or dentist shall not qualify the employee for sick leave pay. Whenever possible, appointments by reason of illness or non-compensable injury shall be made outside of working hours. Where such appointments must be made during working hours, the employee shall apply to the Employer, in writing, at least two (2) working days prior to his/her appointment date for unpaid time off to keep such an appointment. Time not worked by an employee because of visits to a doctor for an industrial injury shall be paid by the Employer at the employee's applicable rate of pay. Emergency appointments shall not be subject to the two (2) day rule.

**13.7   UNUSED SICK LEAVE:** Any unused sick leave days shall be paid by the Employer in January following the sick leave year. On termination of employment, an employee will have their remaining sick leave balance paid out by the Employer. No employee who has begun a scheduled vacation may convert the time off to sick leave instead of vacation because of an illness incurred after vacation began.

## SECTION 14.   PENSION/RETIREMENT BENEFITS

**14.1   CONTRIBUTIONS:** The Company will contribute the sum of one dollar ($1.00) per hour worked or paid for, exclusive of overtime hours, for each individual employed under this Agreement to a non-matched 401K Plan. Contributions will be made at year end. The parties agree that the contributions to the Plan shall be made no later than January 31st of the year following the earned credit.

**14.2** The Employer agrees that, in the event that an employee terminates anytime prior to year end, he/she shall be eligible for pension contributions earned and payable at year end as per Subsection 14.1 above. For the purpose of this section, each hour, other than overtime hours, for which payment is made to an employee, shall be deemed to be an hour worked.

**14.3   WAITING PERIOD:** For current employees, pension/retirement benefit contributions shall continue to commence after six (6) months of employment in the Industry.  For employees hired after June 15, 2006, contributions shall commence after twenty-four (24) months with the Employer. Employees must be employed until December 31st after completing the first twenty-four (24) months of employment.

**14.4**   The Company shall amend the 401(k) plan to permit employees to contribute funds, including catch-up contributions for eligible employees.

## SECTION 15.   JURY DUTY

**15.1**   **BENEFIT:**   An employee who is summoned and reports for jury duty shall receive the difference between jury pay and his/her regular daily rate of pay for each day for which he/she reported for jury duty and/or orientation and on which he/she would normally have worked.

**15.2**   **RETURN TO WORK:**   Day shift employees called for jury duty or examination and excused by the court prior to 12 noon shall return to work for the balance of their day shift and shall be paid for the difference between jury pay or examination pay, if any, and their straight-time hours lost. Night or swing shift employees called for jury duty or examination and excused by the court prior to 12 noon shall report for their regular night shift or swing shift work and shall not be eligible for any jury pay under this section. Night or swing shift employees shall not be required to serve on jury duty in the daytime and work night shift or swing shift on the same calendar day, but shall receive the difference between their jury pay and their regular shift pay lost.

**15.3**   **PROOF OF ATTENDANCE:**   Employees will present proof of service, including time served and amount of pay received.

## SECTION 16.   GENERAL BENEFITS

**16.1**   All uniforms, caps, gowns, aprons, hoods, with reasonable limited laundry service, oilskin aprons, rubber aprons, rubber boots, knives, steels, whetstones, and other tools of same shall be furnished free of cost to all employees who use them in the performance of their work; and the Employer shall keep the same dressed, sharpened, and otherwise in proper order without cost to the employee.

    **16.1.1  OVER SHOES:**   Over shoes shall be provided as needed.

**16.2**   **COMPUTING OVERTIME:**   Paid absences from work, such as vacations, holidays, and sick leave, shall be considered as time worked for the purpose of this Agreement but shall not be deemed as time worked for the purpose of computing overtime.

**16.3**   **COMPANY MEETINGS:**   Time spent in mandatory Company meetings called by the Employer, before or after the day's work, shall be considered as time worked and shall be paid for in accordance with the provisions of this Agreement.

**16.4**   **MINIMUM WAGE/BENEFITS:**   No employee receiving wages, other benefits or privileges, either above the minimum herein or not provided for herein shall have such benefits or privileges taken away by reason of any provisions of this Agreement.  The Employer agrees that no employee shall be compelled or allowed to enter into any individual contract or agreement with his/her Employer concerning wages, hours of work, and/or working conditions that provide benefits less than the terms and provisions of this Agreement. Where the basis for amounts paid over the wage rates provided for in Section 10 Wages hereof have been specifically set forth, in writing, to the employee, they may be discontinued when the reason for their payment ceases to exist and the employee has been so advised, in writing, with a copy to the Union.

**16.5** The Company shall design, establish, and maintain a Pay-For-Performance (PFP) plan for bargaining unit employees. The PFP plan shall allow employees to earn up to six hundred dollars ($600) per year based upon Company performance against predetermined goals.

### SECTION 17.  SENIORITY

**17.1** **POSTING:** Where a higher-rated position becomes open, the Employer agrees to post notice of such job opening and further agrees to consider [up to three (3) qualifying] employees who apply for such opening, based upon their seniority, attendance, attitude, and work performance. However, in order for an employee to be eligible for the job, application must be made, in writing, within two (2) working days following posting of the notice. Jobs will be posted according to job title and as commonly known. Employees will be given a fair trial for all jobs open in the unit. The Employer may promote employees to Working Forepersons without jeopardizing their former rating.

**17.2** **ACQUISITION OF SENIORITY:** There shall be an eleven (11) workweek probationary period for all new employees, during which time they may be discharged for any reason. Following completion of such period, the employee shall become a regular employee for all purposes under this Agreement; and his/her seniority shall date from the first (1st) day of employment. Seniority shall be applicable among probationary employees as a group when an issue of seniority arises between two (2) or more probationary employees.

**17.3** **TERMINATION OF SENIORITY:** Subject to the provisions of this Agreement, seniority shall be based upon continuous service with the Employer but no employee shall suffer loss of seniority unless he/she:

> **17.3.1** Is discharged for cause;

> **17.3.2** Resigns or voluntarily quits;

> **17.3.3** Is absent from work for six (6) consecutive months, except in cases of approved leaves of absence;

> **17.3.4** Is absent from work for twenty-four (24) consecutive months due to injury or illness on or off the job;

> **17.3.5** Is absent from work for more than thirty (30) days due to death in the immediate family (as defined in Section 9 Leaves of Absence) or otherwise;

> **17.3.6** Fails to return to work within three (3) days after receipt of notice of recall from layoff as provided in Subsection 17.7 below.

**17.4** **APPLICATION OF SENIORITY:** Seniority shall be by classification throughout the Employer's plant, unless the Employer and the Union agree that seniority is by classification within designated departments of the Employer's plant.

**17.5** **LAYOFF/RECALL:** In the reduction of the number of employees due to lack of work, the last employee hired in the classification shall be the first to be laid off and, in recalling, the last employee laid off in that classification shall be the first recalled until the list of employees previously laid off has been exhausted. The Employer shall give written notice of layoff to the employee and the employee shall provide the Employer with his/her current address and telephone number at the time of layoff, and the employee is to keep the Employer advised of any change in address. The Employer agrees that regular employees laid off and not terminated for cause, as defined in Section 4 Discharge, shall have seniority rights on layoffs and rehiring for extra and/or steady jobs subsequently available with the Employer prior to the hiring of any new employees.

**17.6   NOTIFICATION OF RECALL:** When an employee is recalled to return to work after layoff and he/she cannot be reached by telephone, the Employer shall notify the employee of such recall either by telegram or certified letter addressed to his/her last known address appearing in the Employer's records and a copy of such communication shall be sent to the Union.

**17.7   REPORTING AFTER RECALL:** When an employee is recalled after layoff, he/she shall have three (3) business days to report after receipt of such recall. If after three (3) such telegram or certified letter is returned to the Employer unclaimed or undeliverable, such employee's seniority shall be considered broken and all rights forfeited three (3) business days after the date such telegram or certified letter would have been received. An employee who is recalled from layoff and who, at the time of recall, is working for another Employer in the Meat Industry, shall have sufficient time to complete the workweek in his/her other employment before reporting on the recall so long as he/she informs the Employer who is calling him/her.

**17.8   NOTICE OF RETURN:** Employees who are absent from work over forty-eight (48) hours shall be required to give the Employer twenty-four (24) hours' notice of their intention to work.

**17.9   SENIORITY LIST:** A seniority list of all employees in the bargaining unit will be posted in the plant and a copy will be given to the Union. Such seniority list shall be revised and brought up to date every six (6) months and a revised copy shall be furnished to the Union.

**17.10 EFFECT OF LEAVE ON SENIORITY:** An employee who accepts employment elsewhere while on personal leave of absence from his/her Employer shall forfeit his/her seniority rights and he/she shall be considered as a voluntary quit. When a personal leave of absence is granted to an employee by the Employer, a written notice shall be given to evidence such an arrangement. The Employer will abide by the provisions of the Selective Service Act as amended and interpreted or other applicable legislation governing reinstatement rights of employees entering service under such legislation.

### SECTION 18.   GRIEVANCE AND ARBITRATION

**18.1   GRIEVANCES:** A grievance shall be defined as a matter of dispute which arises over the interpretation and application of any of the sections of this Agreement.

> **18.1.1** Any matter of dispute shall be addressed directly by the Union with the Employer or by the Employer with the Union and a settlement attempted.

> **18.1.2** If the dispute is not settled directly, the grievance shall be referred to the other party, in writing, specifying the complaint and setting forth the facts on which the grievance is based and the contract provision violated. The written grievance must be filed by certified letter or in person within ten (10) calendar days of the date of the occurrence of the dispute, or knowledge thereof, whichever is later.

> **18.1.3** Unless extended by mutual agreement, an Adjustment Board hearing shall be held within ten (10) calendar days of the date the grievance was filed; provided, however, the parties must have met and attempted to resolve the grievance before any hearing can be convened.

> The right to an Adjustment Board hearing or arbitration is lost if the grieving party fails to follow these steps.

**18.1.4** An Adjustment Board shall be established and convened for the purpose of hearing and deciding grievances. The Adjustment Board (Board) shall consist of two (2) representatives of the Union and two (2) representatives of the Employer. The Board shall meet within two (2) weeks of such notification and request, unless the time is mutually extended. In any proceeding before the Adjustment Board, the Employer shall be represented by an Employer representative and the Union member involved shall be represented by the Union. Proceedings before the Board shall be conducted in accordance with the rules of procedure adopted by the Union and the Employer. A majority decision reached by the Board shall be final and binding on all parties. In the event that any matter submitted to the Board cannot be settled within five (5) business days, excluding Saturday, Sunday and holidays, (unless the time is mutually extended), the parties may choose an impartial arbitrator, and the grievance shall be submitted for disposition to the arbitrator, whose decision shall be final and binding on all parties, provided the moving party requests arbitration within ten (10) business days from the date the Adjustment Board met, otherwise the right to arbitration is lost. The parties will request a bench decision from the arbitrator at the close of the arbitration hearing. In the event that the parties cannot agree upon the selection of the impartial arbitrator within five (5) business days, exclusive of Saturday, Sunday, and holidays, the matter submitted shall then be referred to the Federal Mediation and Conciliation Service for a list of arbitrators.

**18.2   AUTHORITY:** Neither the Adjustment Board nor an arbitrator shall have the authority or power to add to, alter, or amend the terms and provisions of this Agreement.

**18.3   EXPENSES:** The compensation of the arbitrator and all expenses incurred by the arbitrator and any expense incidental to the work of the Adjustment Board and authorized by it, shall be borne one-half (½) by the Union and one-half (½) by the Employer, provided, however, that this shall not be deemed to include any cost or expense of presentation by either of the parties to the dispute.

**18.4   MONEY CLAIMS:** A claim of any employee for payment of any additional compensation or sum due under the terms of this Agreement shall not go beyond a thirty (30) day period, unless notified within ten (10) days of the pay period when such claimed sums should have been paid.

## SECTION 19.   UNION AFFAIRS

**19.1   UNION VISITATION:** Only an authorized representative of the Union shall be allowed to visit the places of business of the Employer which are covered by this Agreement for the purpose of observing working conditions and to confirm that this Agreement is being followed, so long as the representative has first informed management that he/she is on the premises. The visitation right shall be exercised so that employees are not interrupted.

**19.2   UNION ACTIVITY:** No employee shall be discriminated against for membership in or legal activity on behalf of the Union.

**19.3   UNION SHOP CARD:** The Union Shop Card is the property of the United Food & Commercial Workers International Union and is loaned for display to the Employer who signs and abides by this Agreement. The Union Shop Card can and may be removed from any establishment by the Union officials for any violation of this Agreement. The Union Shop Card shall be displayed prominently and visible to the public.

**19.4   DUES CHECKOFF:** The Company, for its employees, shall, for the duration of this Agreement between the parties, deduct from the first pay of each month Union dues for the current month and promptly remit same to the Union. The initiation fees of the Union shall be deducted by the Company and remitted to the Union in the same manner as dues' collections. No deduction, either for dues or initiation fees, shall be made by the Employer unless specifically authorized by the individual employee by signed authorization card.

**19.5   STEWARDS:** Stewards may be designated by the Union.

**19.6   BULLETIN BOARDS:** The Employer and the Union shall jointly provide and share a glassed-in and lockable bulletin board in the employee's lunch room for the purpose of posting notices of official Union business and other information, such as times and places of meetings.

## SECTION 20.   WORKING CONDITIONS AND SAFETY

**20.1   FIRST-AID EQUIPMENT:** The Employer shall be responsible for the installation and maintenance of first-aid equipment, and it shall be kept throughout the plant in places readily and conveniently accessible to the employees.

**20.2   PROTECTIVE CLOTHING:** The Employer shall furnish mesh gloves (when required) and protective aprons for all employees who use a knife in the performance of their work. Such equipment and hard hats, where furnished by the Employer, shall be worn by the employees. Where the employees wear cotton gloves on the job, the Employer will provide them at no expense to the employees so long as they are treated with care and benefit is not abused.  The Employer shall also provide shoe sole inserts at no cost to the employee.

**20.3   GOVERNMENTAL REGULATIONS:** All sanitary and safety regulations of federal, state, and local governments shall prevail in all departments. Failure to follow such regulations shall be considered insubordination subject to disciplinary action.

**20.4   INJURIOUS WORKING CONDITIONS:** Pasteur-Ray lamps or other working conditions which are injurious to the health and safety of the employees shall be directed to the attention of the Employer at which time the Employer shall immediately investigate the alleged condition, shall meet with representatives of the Union to discuss the alleged condition, and shall immediately take the necessary steps and measures to correct such condition if found to be injurious.

**20.5   EFFICIENT OPERATIONS:** Policy regarding speed of operation shall be made on the basis of fairness and equity, consistent with quality of workmanship, efficiency of operations, and the reasonable working capacity of normal operation. Any dispute which may arise with respect to workloads shall be subject to the grievance procedure under Section 18 of this Agreement.

**20.6   ROTATION:** Rotation will be required within a work group where ergonomically justified. Rotation will be allowed within a work group where feasible.

## SECTION 21.   JOB SECURITY

**21.1   NEW METHODS OF OPERATION:** The parties to this Agreement have discussed new methods of operation and subcontracting of work being performed by bargaining unit employees and agree that both parties shall discuss the effects of additional new methods of operation and subcontracting on job security of the employees and will work to that end. When additional subcontracting of any existing operation or new method of operation becomes necessary or

desirable, the Employer will notify the Union. The Union shall discuss the effects on the job security of the employees and the parties will meet for that purpose. The Employer agrees to delay layoffs caused by subcontracting or new methods of operation until at least thirty (30) days subsequent to its notice to the Union of its intention so that the parties have ample time to suggest methods of solving layoff problems. The Employer shall furnish the Union facts and suggestions with regard to jobs available in the Employer's plant and methods of solving layoff.

## SECTION 22.  SEPARABILITY

**22.1**    The provisions of this Agreement are deemed to be separable to the extent that if and when a court of last resort adjudges any provision of this Agreement in its application between the Union and the undersigned Employer to be in conflict with any law, such decision shall not affect the validity of the remaining provisions of this Agreement, but such remaining provisions shall continue in full force and effect, provided further, that in the event any provision or provisions are so declared to be in conflict with law, both parties shall meet within thirty (30) days for the purpose of renegotiation and agreement on the provision or provisions so invalidated.

## SECTION 23.  TRANSFER OF OWNERSHIP

**23.1**    In the event of change of ownership of the operation, whether it be voluntary, involuntary, or by operation by law, the Employer shall immediately pay off all obligations, including accumulated wages, pro rata of earned vacations, sick and accident contributions, accumulated prior to the date of the change of ownership. If any Owner or Employer hereunder sells, leases, or transfers its business or any part thereof, whether voluntary, involuntary, or by operation of law, it shall be the Owner's or Employer's obligation to advise the successor, lessee, or transferee of the existence of this Agreement and such successor, lessee, or transferee shall be bound fully by the terms of this Agreement and shall be obligated to pay the wages, vacations, sick and accident contributions, and comply with all other conditions of this Agreement in effect at the time of the sale, lease, or transfer; and in the event the seller or transferor fails to pay its obligations hereunder, shall assume all obligations of this Agreement in the place and stead of the Employer signatory thereto the same as if the successor, lessee, or transferee had been the Owner or Employer from the beginning.

Before completion of any such transfer, the Employer shall give written notice to the buyer, with a copy to the Union, of the existence of this Agreement, furnish the buyer with a copy of this Agreement, and call the buyer's attention particularly to this section concerning transfer of ownership.

## SECTION 24.  SAVINGS CLAUSE

**24.1**    If any contract provision may not be put into effect because of applicable legislation, executive order, or regulations dealing with wage or price stabilization then such provision, or any part thereof, shall become effective at such time, in such amounts, and for such periods as will be permitted by law at any time during the life of this Agreement and any extension thereof with prospective effect.

## SECTION 25.  NO STRIKE OR LOCKOUT

**25.1**    During the term of this Agreement, there shall be no strike, sympathy strikes, picketing, or lockouts pending or following any decision by an Adjustment Board or arbitrator, nor shall there be a stoppage of work in violation of any other provision of this Agreement. Nothing herein shall preclude the Union or its members from honoring lawful picket lines or strikes during the term of this Agreement.

## SECTION 26.  EXTENSION AND SCOPE

**26.1**    This Agreement shall be binding upon the heirs, executors, administrators, and assigns of the parties hereto. This Agreement shall remain in full force and effect from the 10th day of April 2017, to and including the 10th day of August 2020, and shall be automatically renewed from year to year thereafter unless either party, at least sixty (60) days prior to August 10, 2020, or at least sixty (60) days prior to August 10th of any succeeding term, shall notify the other party, in writing, of its intention and desire to change, modify, or terminate this Agreement.

In the event this Agreement is reopened pursuant to the provisions hereof and no agreement is reached within sixty (60) days of such reopening, then nothing herein contained shall be construed to prevent the Union from taking strike action or other economic action desired by it, or the Employer the right to lockout.

FOR THE EMPLOYER:

**SWISS AMERICAN/**
**HORMEL SAUSAGE**

FOR THE UNION:

**UNITED FOOD & COMMERCIAL**
**WORKERS UNION**
**8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

DATE   _MAY  1,  2017_

BY _____

DATE   April 26, 2017